IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JERRY NELSON, *as personal*     *
*representative of the Estate of*
*Eddie Lee Nelson, Jr.*, and     *
MICHELE DUSHANE*, as surviving*
*spouse of Eddie Lee Nelson,*     *
*Jr.,*
                                *
    Plaintiffs,
                                *
vs.                                        CASE NO. 4:20-cv-213 (CDL)
                                *
CORRECTHEALTH MUSCOGEE, LLC,
OFFICER KEYVON SELLERS, NURSE     *
KIMBERLY BRAXTON, and ANGELA
BURRELL, RN,                       *
                                *
    Defendants.                *

_____

O R D E R

    This action arises from the tragic death of Eddie Lee Nelson. Nelson was a pretrial detainee in the Muscogee County Jail when his cellmate, Jayvon Hatchett, killed him. Plaintiffs are Nelson's surviving spouse and the representative of Nelson's estate. They assert claims under 42 U.S.C. § 1983 against one corrections officer and two nurses, arguing that they were deliberately indifferent to a known, substantial risk of serious harm posed by Hatchett. Plaintiffs also assert state law claims against the nurses and their employer. Defendants' summary judgment motions are pending. As discussed below, the Court denies the summary judgment motions filed by Keyvon Sellers and

Kimberly Braxton (ECF Nos. 148 & 170).  The Court also denies the summary judgment motion filed by CorrectHealth Muscogee, LLC (ECF No. 172).  The Court grants the summary judgment motion filed by Angela Burrell (ECF No. 171).

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed for purposes of the present motions.

On August 25, 2020, Jayvon Hatchett, who is black, entered an AutoZone store and stabbed a white clerk in the back multiple times.  Hatchett was arrested the next day on charges of aggravated assault and possession of a knife during the

2

commission of a crime.   Neither the arrest paperwork nor the arrest warrant indicates the victim's race or suggests that the stabbing was racially motivated, but the transport officer, Columbus Police Department Corporal Antonio Burgess, learned about the nature of Hatchett's violent conduct and the racial motivation behind it, and he shared that information with Braxton and Sellers when he brought Hatchett to the Jail.

Hatchett arrived at the Jail at around 1:13 p.m.   Due to COVID-19, arrestees had to be medically screened by a nurse before being admitted to the Jail.   Burgess and Hatchett sat quietly for a few minutes as they waited for a nurse, then Burgess, who is black, asked Hatchett, "why."   Def.'s Notice of Manual Filing Attach. 1, MCJ Security Video "20200826HATCHETINTOXAREAWITHMIC.exe" 1:16:21 PM to 1:16:36 PM ECF No. 149.   Hatchett responded something along the lines of "they been shoot killing black people."   *Id.* at 1:16:40 PM to 1:16:45 PM.   Burgess lectured Hatchett for a few minutes about black-on-black crime and shared his thoughts on "agitators" within the Black Lives Matter movement.   *Id.* at 1:16:46 PM to 1:20:22 PM.   Burgess again asked Hatchett why he did it, and Hatchett referenced a video.   *Id.* at 1:24:13 PM to 1:24:24 PM. Burgess responded, "that don't make no sense, man," said he was surprised Hatchett "didn't get killed for some damn, f***ing

racial charge," then confirmed that the stabbing victim was "a white guy." *Id.* at 1:24:25 PM to 1:24:36 PM.

Nurse Kimberly Braxton entered the room to screen Hatchett for COVID-19.  Her job was to have incoming inmates complete a form about their possible exposure to COVID-19 and to take each inmate's vital signs.  As Braxton was screening Hatchett, she and Burgess had the following exchange with Hatchett:

> Burgess:  Listen to this young man's story.  He went to the AutoZone and stabbed a white man just because of what's happening.
>
> Braxton:  You hurt somebody?
>
> Burgess:  Just because of what's happening with . . .
>
> Braxton:  What you stab him with?
>
> Burgess:  A knife!  Just because of what's happening with all this other, you know, police shooting stuff.
>
> Braxton:  Oh, my God!  How old are you?
>
> Hatchett: Nineteen.
>
> Braxton:  Oh, baby.
>
> Burgess:  Can you believe that?  I'm trying to have a man-to-man talk with him . . . why.  Don't he know that's a hate crime?  I'm surprised they didn't hit him up with that.  I would have thrown the book at you, man.

*Id.* at 1:26:11 PM to 1:26:46 PM.

Braxton recognized Hatchett from when he had been arrested a few days earlier, and she believed she had a good rapport with him, so she asked him why he stabbed the clerk.  Hatchett responded that he was "just upset because somebody has to do

something." Burgess Dep. Ex. 1, Investigative Rep. at Nelson000915, Sept. 18, 2020, ECF No. 151-1 ("Investigative Rep.").[1] Braxton responded, "Son, this ain't the way to do it." *Id.* Braxton believed that something was "a little off" about Hatchett and that "he just wasn't altogether there," although he "didn't seem violent to" her while he was in her presence. *Id.* Braxton recommended a psychological exam for Hatchett because of his crime and his temperament. *Id.* Braxton did not tell her supervisor or anyone else at the Jail about what she learned about Hatchett's crime, although she later stated that when an inmate tells an intake nurse that he has a disdain for others because of their race, the intake nurse relays that information to Jail officers because "you want to keep them separated." Braxton Dep. 46:17-47:8, ECF No. 152.[2]

After his COVID-19 screening, Hatchett was booked into the Jail, and correctional officer Keyvon Sellers met Hatchett at the booking wall for a pat down and initial processing. While Sellers was doing his work, Burgess and Hatchett spoke to him:

Burgess: Tell him what you did.

Hatchett: I had seen the video . . . killing black people.

---

[1] Plaintiffs submitted various portions of the Investigative Report as separate exhibits. For the sake of simplicity, the Court cites the complete report that is an exhibit to Burgess's deposition.

[2] Plaintiffs pointed to the expert report of Angela Goehring, which cites this deposition testimony.

Burgess:  That guy in Wisconsin that got shot?  So he
goes to AutoZone and stabs a white guy in the back.

Def.'s Notice of Manual Filing Attach. 2, MCJ Security Video
"8_Hatchettonwall@Booking.mp4," 9:30-9:48, ECF No. 149.  Sellers
later reported to an investigator that Hatchett said, "I was
watching the news and I decided I was gonna stab a white guy."
Investigative Rep. at Nelson000913.  Sellers testified that if
he learns something during the intake process that makes him
believe that the inmate "needs to be housed alone, or might not
get along . . . with others," then he passes that information to
his "sergeant in classification," to "see if we need to get him
a single man cell."  Sellers Dep. 16:25-17:7, ECF No. 153.
Sellers did not tell his sergeant anything about Hatchett; he
testified that "the way [Burgess told him about Hatchett's
crime] didn't give [him] any reason to think he would hurt
anybody while he was in our custody."  *Id.* at 18:12-17.  It is
undisputed that Hatchett was calm, cooperative, quiet, and
polite during the intake process.  During the afternoon, Sellers
told two of his colleagues, deputy Billy Lee and correctional
officer Sharon Peters, about Hatchett—that he had watched the
news and stabbed a white clerk in the back.  Sellers did not
discuss Hatchett with any classification officers.

Hatchett spent the afternoon in the male holding cell
without incident.  He had his medical intake screening with

nurse Angela Burrell around 8:20 p.m.   Hatchett denied suicidal
thoughts, and Burrell concluded that he did not show signs
suggesting a risk of suicide or self-injurious behavior.
Hatchett reported that he did not have any physical or mental
complaints, and Burrell did not observe any acute signs or
symptoms suggesting he needed immediate medical intervention.
Burrell asked Hatchett whether he had a history of violent
behavior, and he told her that he stabbed someone.   Hatchett did
not volunteer any other information about the stabbing, and
Burrell did not ask.   Burrell did note the stabbing on
Hatchett's intake screening form.   Sellers Mot. Summ. J. Ex. 12,
Hatchett Intake Screening Form at Nelson004843, ECF No. 148-14.
Hatchett did not tell Burrell that he wanted to kill a white
person or a police officer.   Burrell Dep. 75:12-17, ECF No. 162.
He did not make any threats.   Burrell recommended a mental
health evaluation because of Hatchett's overall demeanor.

A classification officer interviewed Hatchett to determine
his security level.   Among other questions, the classification
officer asked Hatchett if he needed to be kept separated from
anyone.   Streeter Dep. 10:1-10, ECF No. 176.   Hatchett did not
tell the classification officer that he wanted to kill a white
person, that he had stabbed a white person, or that he was upset
about police shootings he saw on the news.   *Id.* at 16:17-25.   If
someone had told the classification officer that Hatchett

stabbed a white person and stated that he wanted to kill a white person, then the classification officer "would have tried to put him separate from the other race" or "by himself." *Id.* at 17:6-19.  Hatchett was classified as a "maximum security" inmate because he was charged with a violent crime.

After his initial classification and medical screening, Hatchett was moved from the male holding cell to a COVID-19 quarantine cell with an inmate named Rae Nolan, who is white. The next day, on August 27, 2020, Sellers and another officer escorted Hatchett to the office of a licensed professional counselor named Jacqueline White, who completed a mental health evaluation of Hatchett.  She asked Hatchett specific questions to help her gauge his mental state, and she observed his behavior.  Although White knew that Hatchett had been arrested for aggravated assault, she did not know any specifics about Hatchett's crime or the motivation for it, and she did not ask. At the end of her assessment, White concluded that Hatchett did not pose a threat to himself or others, and she determined that he did not need to be housed in a solitary holding cell.

Also on August 27, 2020, Nelson joined Hatchett and Nolan in the quarantine holding cell.  Like Hatchett, Nelson was classified as a maximum-security inmate.  Hatchett told both Nolan and Nelson that he had been watching a video about police shootings that made him mad, and he stabbed the first white man

8

he saw.   According to Nolan, there was no tension between him, Hatchett, and Nelson, and there were no racial slurs.   Nolan was relocated to another cell on August 31, 2020.   Clifford Sheppard, who is black, joined Nelson and Hatchett in the cell on September 1, 2020.   Sheppard reported that Hatchett and Nelson were buddies who played cards together.   Sheppard was moved to another cell on September 4, 2020.   On September 4, 2020, Nelson saw a nurse for shortness of breath, and he reported that he had been having out of body experiences.   He did not report that anyone had made threats of violence against him.   After the nurse found that Nelson's temperature and oxygen levels were normal, she sent him back to his cell with Hatchett.

Between August 27 and September 4, Sellers worked on the floor where Hatchett and Nelson were housed three times.   He did not see Hatchett display any behavior suggesting that he posed a threat to another inmate.   Neither Nelson nor Nolan voiced any concern to Sellers about being in danger from or threatened by Hatchett, and there is nothing in the Jail records to suggest that they complained of threats to any other correctional officer.   Plaintiffs acknowledge that they have no evidence that Hatchett made threats of violence to anyone at the Jail during his incarceration.   If Hatchett had made threats against Nelson or white people, or if Hatchett had voiced a desire to kill or harm someone, he would have been reassigned to other housing.

At 1:30 a.m. on September 5, 2020, an inmate alerted a correctional officer to a disturbance in Hatchett and Nelson's cell. The correctional officer saw Hatchett kneeling on Nelson with his hands around Nelson's neck. Nelson was covered in blood. The correctional officer ordered Hatchett to get off of Nelson, but Hatchett refused and stated, "he put a hair in my sandwich." Golden Dep. 19:3-4, ECF No. 164. When backup arrived, Hatchett got off of Nelson's body, and the officers tried to resuscitate Nelson. They could not save him, and Nelson was pronounced dead. When investigators later interviewed Hatchett, he told them that he killed Nelson over a hair in his sandwich.

Hatchett underwent an emergency psychiatric evaluation shortly after he killed Nelson. According to the psychiatrist's notes, Hatchett "mentioned about his roommate talking about racial things. vague about the sequence of events occurred between the two. Later the incident occurred." Pls.' Resp. to Defs.' Mot. Summ. J. Ex. 12, Psychological Progress Note, ECF No. 188-12. After the mental health evaluation, an investigator noted, "INMATE IS TO BE KEPT ALONE, ESPECIALLY FROM INDIVIDUALS OF WHITE RACE." Pls.' Resp. to Defs.' Mot. Summ. J. Ex. 10, Jail Inmate Comment Page, ECF No. 188-10.

DISCUSSION

Plaintiffs brought § 1983 claims against Braxton and Sellers, asserting that they were deliberately indifferent to a known risk of serious harm to Nelson, in violation of the Fourteenth Amendment.[3] Plaintiffs also brought state law negligence claims against Braxton, Burrell, and CorrectHealth Muscogee, LLC. The Court addresses each claim in turn.

## I.  Section 1983 Claims Against Braxton and Sellers

Jail and prison officials have a duty to protect inmates from violence at the hands of other inmates. *Mosley v. Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020).[4] But, not every injury suffered by one inmate at the hands of another "translates into constitutional liability for prison officials responsible for the victim's safety." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 835, 834 (1994)). A constitutional violation only occurs when an official is subjectively aware of a "substantial risk of serious

---

[3] Plaintiffs initially brought a § 1983 deliberate indifference claim against Burrell, but they abandoned that claim. Pls.' Resp. to Defs.' Mots. for Summ. J. 3-4 & n.1, ECF No. 188. Burrell is therefore entitled to summary judgment on this claim.

[4] Nelson was a pretrial detainee when Hatchett attacked and killed him, so Plaintiffs' claims arise under the Fourteenth Amendment's Due Process Clause. *Grochowski v. Clayton Cnty.*, 961 F.3d 1311, 1318 (11th Cir. 2020). A jail "official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment." *Id.* (internal quotation marks omitted) (quoting *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047 (11th Cir. 2014)). In analyzing Fourteenth Amendment deliberate indifference claims, the Eleventh Circuit applies decisional law on Eighth Amendment deliberate indifference claims because the standard is the same in both contexts. *Id.*

harm" but does not respond reasonably to the risk. *Mosley*, 366 F.3d at 1267-68 (quoting *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), *abrogated on other grounds abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). To prevail on a failure-to-protect claim "brought under § 1983, the plaintiff must show: (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) a causal connection between the defendants' conduct and the [constitutional] violation." *Brooks*, 800 F.3d at 1301.

"The first element of deliberate indifference—whether there was a substantial risk of serious harm—is assessed objectively and requires the plaintiff to show 'conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety.'" *Marbury v. Warden*, 936 F.3d 1227, 1236 (11th Cir. 2019) (per curiam) (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)). For the second element—whether the defendant was deliberately indifferent to the risk—the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference." *Id.* (internal quotation marks omitted) (quoting *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007)). Deliberate indifference

exists if the official responds to the known risk in an objectively unreasonable manner. *Id.*

To establish the "substantial risk of serious harm" element, there "must be a 'strong likelihood' of injury, 'rather than a mere possibility,' before an official's failure to act can constitute deliberate indifference." *Brooks*, 800 F.3d at 1301 (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.1990) (per curiam)). That is because "[t]he unfortunate reality is that 'threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.'" *Marbury*, 936 F.3d at 1236 (quoting *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996)). "Successful deliberate-indifference claims will generally require some further reason—beyond the plaintiff having informed the defendant officers of the threat—that a prison official could have concluded that a particular threat evidenced a substantial threat, rather than the mere possibility, of serious harm." *Id.*

A plaintiff can establish a substantial risk of serious harm by showing that jail officers knew of a specific threat against an inmate.[5]   *Rodriguez*, 508 F.3d at 621-22.   But a

---

[5] A plaintiff can also establish a substantial risk of serious harm by demonstrating that the jail's conditions were so extreme that they posed an unreasonable risk of serious injury. *Marsh*, 268 F.3d at 1029. In *Marsh*, the plaintiff met that standard because he alleged facts to show that he was confined to a prison "where violent prisoners" were "allowed free reign of a jail with easy access to weapons without proper supervision by guards." *Id.* Plaintiffs rely

specific threat is not necessary if there is enough other information to show a specific risk of serious harm. In *Bowen v. Warden*, for example, there was no specific threat before an inmate killed his cellmate, but the officers had plenty of information to suggest that the attacker posed a specific risk of serious harm to any potential cellmate. 826 F.3d 1312, 1321 (11th Cir. 2016). Specifically, officers knew that (1) the attacker was a convicted murderer, (2) the attacker was "a severe paranoid schizophrenic who suffered from auditory hallucinations and violent delusions involving his cellmates," (3) the prison designated the attacker as a "Level III mental health inmate" who could experience "delusional thinking and/or hallucinations," (4) the attacker had recently been placed alone in a lock-down cell for assaulting his previous cellmate, and (5) the prison's guidelines required that the attacker be housed alone under the circumstances. *Id.* at 1322 (internal quotation marks and citations omitted); *cf. Rodriguez*, 508 F.3d at 621-22 (finding that the plaintiff adequately alleged a substantial risk of serious harm because the prison was heavily populated with members of the plaintiff's former gang and the plaintiff told officers that some of the gang members in the prison repeatedly told the plaintiff that they planned to kill him for

---

heavily on *Marsh*, but this action is not factually analogous to *Marsh*—this is not a general conditions of confinement case. Rather, it is a case about the degree of risk posed by a specific inmate.

renouncing his gang membership); *Scott v. Miami Dade Cnty.*, 657 F. App'x 877, 882 (11th Cir. 2016) (per curiam) (finding that the plaintiff adequately alleged credible ongoing threats by gang members that jail officials ignored).

Here, although there is no evidence that Hatchett made any specific threats of violence to anyone at the Jail during his incarceration, a reasonable jury could conclude that Sellers and Braxton both had enough information to infer that Hatchett posed a substantial risk of serious harm to white inmates because of the nature of his underlying crime.[6]  Construing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, Sellers and Braxton knew that (1) Hatchett violently attacked the AutoZone clerk by stabbing him repeatedly; (2) Hatchett attacked the clerk without provocation, targeting him solely because he was white; (3) the only reason Hatchett stabbed the clerk was because he was white; (4) Hatchett's sole motivation for his attack of the clerk was his irrational response to the racially charged atmosphere connected to the widespread publicity of whites killing blacks. Despite this knowledge, neither Sellers nor Braxton passed the

---

[6] Braxton was employed by a private company that had a contract to provide medical services to Jail inmates.  She does not dispute that she acted under color of state law for purposes of this § 1983 action. *See West v. Atkins*, 487 U.S. 42, 57 (1988) (concluding that physician contracted to provide medical services to state inmates acts under color of state law when he treats an inmate).

critical information to the Jail officials who were responsible for determining if Hatchett posed a safety risk to others.

Based on this evidence, a jury could conclude that any reasonable corrections officer or intake nurse would have known that Hatchett posed a substantial risk of serious harm to a white detainee. Braxton and Sellers seem to contend that they did not draw any inference of a substantial risk from the information they had, but a jury could conclude otherwise. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]"). Finally, a factfinder could conclude that doing nothing to make sure that the information about Hatchett's violent, racially motivated attack was conveyed to a classification officer or mental health evaluator constituted deliberate indifference to the risk.

The Court understands that there is no deliberate indifference if the officer only knows facts suggesting a generalized possibility of a risk of harm. *See Marbury*, 936 F.3d at 1237 (finding that a vague report of nebulous threats was not sufficient to establish a substantial risk); *Carter v. Galloway*, 352 F.3d 1346, 1349-50 (11th Cir. 2003) (per curiam) (concluding that simply reporting that a cellmate was acting like a "caged animal" and had asked for help faking a hanging

were not enough to show that the prison officials were aware of a substantial risk); *Brown*, 894 F.2d at 1537 (finding no constitutional violation when an officer declined to do anything after the plaintiff reported a "racial problem" in his cell). The Court, though, finds that the facts here are more analogous to those in *Bowen* than to those in *Marbury*, *Carter*, and *Brown*. Again, *Bowen* establishes that an inmate need not make a specific threat against another; a deliberate indifference claim may still exist if the officers had sufficient information to suggest that the inmate posed a specific risk of serious harm. *Bowen*, 826 F.3d at 1321.

Sellers and Braxton contend that even if there is a genuine fact dispute on deliberate indifference, Plaintiffs cannot establish causation.  In general, to establish the necessary causal link, the plaintiff must show that the prison official "(1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence,' and (3) had 'other means available to him which he nevertheless disregarded.'"  *Rodriguez*, 995 F.2d at 1539 (alterations adopted) (quoting *LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993)).

Sellers and Braxton argue that Plaintiffs cannot establish that their conduct caused Nelson's death because they had no

role in classification or housing decisions. But Sellers himself testified that when he learned that an inmate might not get along with others, he alerts Jail classification officials so that the inmate could be placed appropriately. Braxton admitted that if she learned that an inmate had a disdain for others because of their race, she would relay that information to Jail officers so they could keep the inmate separated. In addition, Braxton could refer a patient for a mental health evaluation that would determine whether he was a safety risk to himself or others and thus whether he needed to be housed alone. Moreover, a classification officer confirmed that if she had known what Sellers and Braxton knew that Hatchett stabbed a white person simply because of his race she would have tried to make sure that he was housed alone or apart from white inmates. From this evidence, a reasonable jury could conclude that both Sellers and Braxton had the means to improve the safety of inmates who might be housed with Hatchett despite the risks he posed, but they both decided to do nothing. Thus, a reasonable jury could find a causal link between Nelson's death and the decision by Sellers and Braxton not to tell anyone what they knew about Hatchett. A genuine factual dispute exists as to whether their deliberate indifference proximately caused Nelson's death.

Sellers also argues that his conduct was not the proximate cause of Nelson's death because Hatchett reported that the attack was over a hair in his sandwich.  Thus, Sellers contends, it is pure conjecture to conclude that Hatchett attacked Nelson because of his race.  But Hatchett also stated that his roommate was talking about racial things before the attack, so the Court finds that there is a genuine fact dispute on this issue.

Finally, Sellers argues that even if there are genuine fact disputes on deliberate indifference and causation, he is entitled to qualified immunity.[7]  Qualified immunity protects government officials acting in their discretionary authority from liability for civil damages if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  As discussed above, there is a genuine fact dispute on whether Sellers violated Nelson's Fourteenth Amendment rights by disregarding a known substantial risk of serious harm.  And, as reflected in the authority discussed above, it was clearly established before September 5, 2020 that jail officials have a duty to protect inmates from violence at the hands of other inmates and that officials can be held liable if they knew of a substantial risk

---

[7] Braxton did not assert the defense of qualified immunity.

of inmate-on-inmate violence but disregarded that risk and failed to take reasonable measures to minimize it.  If the jury accepts Plaintiffs' version of what happened, they will have concluded that Sellers knew that Hatchett posed an unreasonable risk of harm to white detainees and that he should not be housed with white detainees, yet, Sellers informed no one of this risk. He was completely indifferent to the known and substantial risk that by remaining silent, Hatchett could be housed with a white detainee.  Based on these findings, if made by the jury, Sellers violated Nelson's clearly established constitutional rights. Accordingly, Sellers is not entitled to qualified immunity.

In summary, genuine fact disputes preclude summary judgment on Plaintiffs' § 1983 claims against Sellers and Braxton.

## II. State Law Claims Against Braxton, Burrell, and CorrectHealth Muscogee, LLC

In addition to their § 1983 claims against Braxton and Sellers, Plaintiffs assert state law claims against Braxton, and Burrell, as well as claims against the nurses' employer under a respondeat superior theory.  The claims against Braxton and Burrell are under a professional negligence theory, though they are not classic medical malpractice claims.  Rather, Plaintiffs assert that Braxton and Burrell had a duty to exercise reasonable care to control Hatchett to prevent him from causing physical harm to others.

20

A medical practitioner "generally has no duty to exercise control over third persons to prevent them from harming others." *Bruscato v. Gwinnett-Rockdale-Newton Cmty. Serv. Bd.*, 660 S.E.2d 440, 443 (Ga. Ct. App. 2008) (quoting *Gilhuly v. Dockery*, 615 S.E.2d 237, 239 (Ga. Ct. App. 2005)). "A narrow exception exists to this rule in situations where a [medical practitioner] has control over a patient who is known to be violent and causes harm to others." *Id.* (quoting *Gilhuly*, 615 S.E.2d at 239). For the exception to apply, the medical practitioner generally must have control over a patient, and the medical practitioner "must have known or reasonably should have known that the patient was likely to cause bodily harm to others." *Id.* For purposes of this test, "control" means the legal authority to confine or restrain. *Keppler v. Brunson*, 421 S.E.2d 306, 307 (Ga. Ct. App. 1992). So, if a medical practitioner has authority to maintain control over a patient and if the medical practitioner knows of the danger the patient poses if control is not reasonably maintained, then the medical practitioner can be liable under this narrow exception.

Braxton contends that she had no duty to warn anyone about Hatchett because she had no information suggesting that he was likely to cause bodily harm to another inmate. But, as discussed above, a jury could, viewing the evidence in the light most favorable to Plaintiffs, conclude that Braxton knew the

21

violent, racially motivated circumstances of Hatchett's underlying crime and thus knew or should have known that he was likely to cause bodily harm to a white detainee. Plus, Plaintiffs' correctional healthcare nurse expert opined that Braxton breached her duty by failing to report Hatchett's motive for the underlying stabbing, failing to document her interaction with Hatchett, failing to alert security staff of Hatchett's violent potential, and failing to refer him for an emergency mental health screening. Pls.' Mot. Exclude Ex. 2, Goehring Rep. 19, ECF No. 182-2. Finally, a jury could also conclude that Braxton could have exercised control over Hatchett because there is evidence that if Braxton had disclosed what she knew about Hatchett's underlying crime, he would have been kept separate from other inmates. Thus, genuine fact disputes preclude summary judgment on Plaintiffs' state law claims against Braxton.

Plaintiffs have failed to point to evidence to establish that Burrell knew or should have known that Hatchett was likely to harm others. Plaintiffs do not dispute that Burrell was never informed of the circumstances of Hatchett's underlying crime—that he was upset about police shootings of black people and decided to stab a random white man for no reason. Plaintiffs speculate that if Burrell had asked Hatchett different or additional follow-up questions, Hatchett might have

disclosed additional facts about his mental state or the reasons for his underlying crime.  Such speculation is not sufficient to create a genuine fact dispute.  Accordingly, Burrell is entitled to summary judgment on Plaintiffs' state law claims.

The remaining Defendant is CorrectHealth Muscogee, LLC, which argues that it is not a proper party because CorrectHealth, LLC employed Braxton, not CorrectHealth Muscogee, LLC.  CorrectHealth Muscogee, LLC did not cite any *evidence* in support of this assertion; it only cited its own answers.  Moreover, Plaintiffs pointed to evidence that the entity that entered the health services agreement with the Muscogee County Sheriff was CorrectHealth Muscogee, LLC.  Pls.' Mot. to Substitute Ex. 1, Contract, ECF No. 181-1.  Accordingly, it is not clear from the present record which CorrectHealth entity employed Braxton, and CorrectHealth Muscogee, LLC is not entitled to summary judgment based on its assertion that it was not Braxton's employer.  Both CorrectHealth entities acknowledge that any claims against them are derivative of the underlying claims against their employee, which means that the claims against whichever entity employed Braxton survive summary judgment.  The Court grants Plaintiffs' motion to add CorrectHealth, LLC as a defendant (ECF No. 196) and terminates Plaintiffs' alternative motion to substitute party.  The Court

expects the parties to determine which entity employed Braxton well before trial.

CONCLUSION

For the reasons set forth above, the Court grants Burrell's summary judgment motion (ECF No. 171) and denies the summary judgment motions filed by Sellers, Braxton, and CorrectHealth Muscogee, LLC (ECF Nos. 148, 170, 172). The Court grants Plaintiffs' motion to add CorrectHealth, LLC as a party (ECF No. 196) and terminates their motion to substitute (ECF No. 181). The Court did not consider the testimony of Mark Ricketts in ruling on this summary judgment motion, so the Court terminates the motion to exclude his testimony as moot (ECF No. 182). This action will be tried during the Court's March 2023 trial term.

IT IS SO ORDERED, this 5th day of December, 2022.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA